Welcome to the 11th Circuit today. We're always glad when we have a pretty full courtroom and I think it's going to get a little bit more full around 930. We have some more visitors coming. Judge Brasher and I are pleased to be sitting today with Judge Alan Windsor. We appreciate his willingness to join us today and he'll be joining us again on Friday. We always appreciate the service of judges, especially judges in our circuit who are willing to come and join us. We're going to be hearing two cases today. The first case is Megan Garcia v. Pamela Casey 21-13632. We are going to have, it looks like for each side, two people are going to be sharing time. For the appellants, we have Thomas Wilson is going to go first and then Mr. Frawley is going to go second. Oh, Ms. Frawley, sorry. Sorry. Mr. Wilson, whenever you are ready. And Mr. Wilson, I see that you have two minutes for rebuttal as well. Thank you, Your Honor. May it please the Court. Thomas Wilson on behalf of the DA defendants. On February 23, 2017, the plaintiffs came to the Blount County Courthouse to represent their client, Lloyd Edwards, at a protection from abuse hearing where the allegations included sexual abuse of a minor. Plaintiffs had subpoenaed records from the Blount County D.H.R.'s investigation into their client, which investigator Kerry Ward delivered at the hearing. The D.H.R. investigation focused not only on Edwards' potential child abuse, but on his addiction to child pornography, which he looked at on his phones. And those phones were key pieces of evidence in D.H.R.'s investigation, which D.H.R.'s records made clear. And after reviewing the records, or excuse me, after receiving the records and having time to review them, plaintiffs met with their client, discreetly collected his phones, and tried to leave. And I'd like to pause here. Anyone watching these events unfold would realize that something was seriously wrong. If this were an episode of Law & Order, the crime would almost feel too kitschy. And deliberately concealing and absconding with key evidence in an ongoing investigation, evidence which itself is contraband, plainly violates Alabama law. The district court managed to conclude the opposite, and went so far as to hold that no reasonable officer could possibly think that probable cause to arrest existed. With the time that I have, I'd like to home in on the two clearest errors in the qualified immunity analysis, and then spend the balance of my time on the state agent immunity analysis. I think that the first, most obvious error with the district court's qualified immunity analysis was its approach to probable cause, and in particular, hammering the defendants for their knowledge or alleged lack thereof of plaintiff's subjective intent. This Court has repeatedly said that acts indicate the intention. Knowing subjective intent with any high degree of certainty is going to be an impossibility, so that's not how probable cause works. The second issue with the probable cause analysis was repeatedly doing what the D.C. Circuit did before the Supreme Court reversed it in Westby. Anything, any action that had a potentially innocent explanation was automatically, according to the district court, invalid to constitute grounds for probable cause. The most obvious example of this, I think, is the district court's repeated reliance on the plaintiff's profession. But no clearly established law suggests that every officer needs to believe that an attorney is going to hold himself to the standards of St. Thomas More. I think anybody who's followed the Alex Murdaugh trial would know that even an attorney can potentially break the law. And if you look at an analogous You noted that the district court did not follow the probable cause standard articulated by the Supreme Court in Westby. Is that in and of itself enough for us to reverse? I absolutely think that that would be enough to reverse, Your Honor. And I think particularly looking at the probable cause analysis in the context of an analogous situation with an analogous form of contraband makes it abundantly clear. So consider Assume you're not simply asking us to say you misapplied the standard, do it again. You are asking us to, in fact, do the analysis here. We are asking, Your Honor, to do the analysis here. We don't think that a remand would be warranted. We think that the facts at the summary judgment stage in particular are well enough developed. There's a very lengthy record here. I think that looking at the probable cause analysis, you know, if you were to What do you think the right standard is? Yes. Thank you, Your Honor. So I think that arguable probable cause is a somewhat commonsensical potential shorthand for the two-pronged qualified immunity framework. I think that what we're seeing, though, in a case like the one below is that the district court simply reversed it and said, well, there's no arguable probable cause, therefore, my analysis is done. I think that, as we argue in our brief, under Westby, that's not where the inquiry ends. There is a much more objective analysis which gets into the clearly established portion of qualified immunity. Maybe so, but if the arguable probable cause is just shorthand for that analysis, then wouldn't it follow that if there were no arguable probable cause, that's that? That's the end of it? Your Honor, I She didn't make that, do that analysis? Your Honor, I would suggest that she didn't do that analysis, and I think that clinging to that analysis is particularly risky because it produces opinions like the one below, where when the district court was analyzing the arresting officer's actions, the district court never mentioned clearly established law. So I think that, you know, when you're thinking about arguable probable cause, you're sort of imagining probable cause on a spectrum, and that's sort of the district court's discretion. But what Westby and what this Court's case is particularly like Gates v. Cocar make clear is that the clearly established inquiry has a little bit more bite than that. There's a more objective analysis where you're asking, is the law sufficiently clear to put the officers on notice, to provide them fair notice that what they're doing is going to violate clearly established law? And my friends on the other side give you nothing to analyze the clearly established prong aside from the Fourth Amendment itself, which they claim is self-defining. Yeah, I'll just say, I mean, I think if the plaintiffs have an argument, it's under the prong of, well, not prong, I guess, but the test for qualified immunity where sort of any reasonable officer would know not to do it, right? So obvious error. What do you say about that? Right, Your Honor. I think that that's how they tee it up in their brief. That's the only approach they take. And I would say that all of the cases that we cited, particularly in our reply brief, in which even attorneys were reasonably suspected by officers of committing a crime, such as the Tittle v. Rains case, suggest that if any law is clearly established, it cuts the other direction. So particularly in the Fourth Amendment context, the law really needs to be clearly established sufficiently to put the officers on notice. Now, again, I would — Well, I mean, the way the district court couched it was to just say, look, police officers know they can't arrest someone for refusing a consensual search, right, and insisting upon a search warrant. Correct. What do you say about that? Correct, Your Honor. And I think the point that we were trying to make in our briefing is that that entirely ignores all of the actions that took place inside the courthouse. So the officers realized that the attorneys had taken the phones, which themselves possessed — which themselves contained child pornography, done a triple take upon seeing a camera, and then tried to leave with that evidence. Now, if you were to look at this in analogous context, imagine a suspected drug dealer provides, you know, two baggies with white powder to his attorneys. The attorneys notice a camera, do a triple take, try to leave with the baggies. On the district court's theory, no reasonable officer could have placed those — placed the attorneys under arrest because the baggies might contain baking soda, and no reasonable officer could possibly think that an attorney would do drugs. Now, that violates common sense and binding precedent. And if I may move on — How important is it for your argument that the phones were — contained child pornography, which is in itself contraband and people cannot possess? For example, if this same scenario had played itself out and someone was being investigated for financial crimes, and on video, you know, the officers who are preparing to execute a search warrant on the criminal defendant see the criminal defendant pass documents to the attorneys where the documents in and of themselves are not contraband, how important is that factor to your argument here today? Your Honor, I think that we can win just under the obstruction analysis. I don't think that we necessarily need to say that they were — that the other — any crime for which they could have been arrested was possession of child pornography. I think the Court's obstruction analysis was also wrong and that that would provide — that that provides an independent basis. Because, again, they were taking this evidence that the defendants had reasonable cause to believe was, in fact, key evidence in an investigation. They knew that it was key evidence and they had a reasonable — Your argument is making maybe a little bit of a slippery slope where, you know, what if — I mean, attorneys are seeking things from their clients all the time, right? The attorneys have to defend their clients. They need to know the information as well. I mean, you know, in Judge Branch's hypothetical, you've got an attorney saying, hey, I need to look at these documents, which are going to be incredibly important in the criminal charges that are going to come to you. Give me the documents. Why should the cops be able to arrest that attorney for just doing normal attorney stuff? Right, Your Honor. I mean, I think that picking one piece of the entire probable cause narrative here is not the way that we are going to approach probable cause. And that's not the way that the Eleventh Circuit approached probable cause. So looking at all of the events collectively together, what I think the narrative that you're describing might look more like would be the defendant officers are observing these key documents that are — let's say that they're evidence of a financial crime and they've just been turned over to the court. And then the plaintiffs, the attorneys, look and talk with their client about them, take possession of them, and then try to leave, recognizing that those exact documents are key components of an investigation. That in itself is going to give rise to some serious questions, particularly as to whether they're obstructing the administration of the law or tampering with the evidence, which is what we have here. Let me — I'm sorry. Oh, I was going to ask you another question that's been bothering me about this case. So you represent the DA defendants. The district court analyzed — and correct me if I'm wrong, but the district court analyzed the qualified immunity analysis and the probable cause analysis as a universe and just said, you know, the question was just, was there probable cause? Was there arguable probable cause? Do we need to do that on a specific defendant-by-defendant basis? Is there any difference as far as the arguable probable cause analysis between you and the other defendants? No, Your Honor. I think that that's the Marks v. Gombinier case, where if probable — the existence of probable cause is an absolute bar to an unlawful arrest claim under the Fourth Amendment. I think that the logic behind that makes sense, because otherwise we would have a situation in which Your Honor could find that there was probable cause for Deputy Ashworth to potentially place the defendants — or, excuse me, the plaintiffs under arrest, but not probable cause for the DAs and then hold them liable for a — for an unlawful arrest claim while simultaneously acknowledging that the arrest itself was lawful. And I would also note that in the Evans v. Stevens decision, an en banc decision from this court in 2005, the court explained that litigants don't get at the summary judgment stage to sort of mix and match narratives. You choose the narrative that is most beneficial to the nonmoving party. If you were to credit our narrative, then we're out of the case. So we're crediting their narrative for the proposition that we ordered the arrest based on the knowledge that Defendant Ashworth provided. One more question, guys. So you haven't addressed state agent immunity for the defamation claims. And I'll just tell you I have a difficult time seeing how state agent immunity applies to defamation in this circumstance. You know, you say in your brief, well, the DA was — you say, as to the DA, the DA was commenting on a criminal prosecution. But if you look at the DA's statement, you know, she makes allegations about ethical breaches for attorneys. She says that they violated the professional rules of conduct. So that's her. For the assistant DA, the guy literally just walks out of a courthouse and comments on stuff going on. So I'm having a hard time seeing how Cranman would apply in that circumstance. Yes, Your Honor. And if I may, I see I'm obviously out of time. If I may just kind of carry that forward. I think what's important is to sort of take a step back and think about what the argument at the state — about state agent immunity is at this stage. So state agent immunity, as this Court has explained, is a lot like qualified immunity. So there are two steps. The first step is to determine whether the immunity attaches in the first instance. And for law enforcement officers, the question is basically, are these officers doing the kind of thing that law enforcement officers usually do? If they are, as with qualified immunity, you proceed to the second step of the analysis. Now, the second step of the analysis under Cranman is whether a particular exception applies. The exception that my friends on the other side have referred to is bad faith. But what's critical is that to prove that exception, you have to offer substantial evidence. They don't. They offer no evidence whatsoever, aside from conclusive allegations, that wouldn't survive Twombly, let alone cell attacks. So the issue here is whether state agent immunity applies in the first instance. And I would suggest to Your Honor that the question then is whether the DA was doing the kind of thing that the DA does on a regular basis. Mr. Kortz, in making its analysis on the Cranman factors, seemed to apply them far more rigidly than you're asking us to apply them. And, in fact, seemed to hone in on the word duty as not just part of the job duties, but more duty as in a requirement, an affirmative requirement to make those statements. Right. Can you address the district court's approach on that? I'd be happy for the chance to, Your Honor. Yes. So what the district court missed was about 20, 21 years of precedent. It only looked to Ex parte Cranman. Now, that was a mistake because Cranman, as we explained in Ex parte Randall, set out a non-exhaustive list of categories. And, again, they typically operate the way you might expect, as this Court has explained, from the qualified immunity analysis. So that was a mistake to treat Cranman as though it were a statute and as though it were an exhaustive statute. It's neither. It is a body of case law that has two decades and that is self-evidently, in the opinion, non-exhaustive. And to Judge Brasher's question about could it be that the DA was operating within the scope of what a DA usually does, I would direct, Your Honor, to a case called Ex parte City of Montgomery. Now, this was not in our brief, but it's 19 Southern 3rd 838. The Alabama Supreme Court stated that it had no difficulty concluding that, quote, disseminating information to the media following arrests was a law enforcement function that satisfied Cranman's fourth category. And we think that the fourth category, by the way, is the strongest argument. So if the Alabama Supreme Court says that commenting to media about an arrest falls within the general scope of duty for a law enforcement officer, surely then it falls in the general scope of duty for a district attorney whose job includes constant communication with the press. So, Your Honor, the issue — Is there no limit to that in your view? In other words, could a law enforcement officer say anything about any criminal investigation and never have a problem with defamation as a matter of Alabama State law? So, Your Honor, respectfully, I don't think that I'm trying to go that far. I think that what might kick in would be the second prong of stated immunity analysis where you could potentially argue bad faith. But I would suggest that this is a particularly clear case because D.A. Casey had a relationship with Carol Robinson at AL.com. She had commented about cases to Carol Robinson before. In Buckley v. Fitzsimmons, the Supreme Court itself explained that district attorneys may have to talk to the press. That may be part of their jobs. I think it's relatively well accepted that district attorneys do talk to the press frequently. So that is going to fall within the scope of their duty under Cranman. And then the burden shifts, just like in qualified immunity, to my friends on the other side to produce substantial evidence. To the contrary, they don't try to do that. So that closes down that claim. Can you speak to the ADA and the comment on the courthouse steps, so to speak? Yes, Your Honor. Now, I think that Scott Gilliland's case is also going to fall within Cranman Category 4 because he is an assistant district attorney, and the comments that he was making were to an arrestee, and they were about the arrestee's grounds for arrest or potential charges. I think that that is squarely within the scope of what you would expect an assistant district attorney to typically do, to approach an arrestee and potentially talk about the charges or the case. Now, my friends on the other side quibble over whether it was, in fact, a question that Mr. Gilliland was asking or whether it was a statement. I would submit that it doesn't actually matter because the subject of the communication was, again, the grounds for the arrest or potential prosecution, which falls squarely within the scope of what an assistant district attorney would do. And can I ask you one last question? We've far exceeded your time, at least as far as the last question that I have. Is it still the case that Mr. Edwards has not been charged with possession of child pornography? To the best of my knowledge, that is. I'm not sure, but I would remind Your Honor that prosecutorial discretion is not necessarily going to suggest one way or the other what was on his phones, and also that in this case the record is unrebutted. The FBI came back and found that there were thousands of images of child pornography on those phones, which is exactly what the defendant officers and the DAs knew. Thank you, and you'll still have two minutes for rebuttal. Thank you, Your Honor. And Ms. Frawley? You may proceed. May it please the Court. My name is Jamie Frawley, and I'm representing the Deputy Sheriffs Sue Ashworth and Brian Ratliff. We are here today to ask this Court not only to reverse the denial of summary judgment to our clients, but also to reverse the grant of summary judgment to the plaintiffs' apologies in this case. We, as Mr. Wilson stated, believe that it would be appropriate for this Court to do the qualified immunity analysis at this point and grant or order that judgment be entered in favor of our clients, but in the alternative would ask that it be at least remanded. Can I ask you a question about your clients? Yes. So, I'm trying to understand sort of who did what in this case. So, am I right that one of the defendants testified in a deposition that, I think it's a she, that she did not think that there was probable cause for an arrest until she spoke with the DA and was ordered to make the arrest? Am I remembering that right? I think Deputy Ashworth testified that she was unsure about the issue because she had never, because this was a very unique fact situation and that she had never encountered in, at that point, I think, 38 years of law enforcement. And so that was the impetus for her call to the district attorneys if she wasn't sure what to do in this particular situation. One of the issues, and this goes in particular, and I'm going to try not to replow the ground that Mr. Wilson has covered, I want to emphasize in terms of the grant to the summary judgment in favor of Ms. Garcia and Mr. Revel. You know, the district court held that there was a genuine issue of material fact on the defamation claims against the district attorneys in part because of the truth defense. Well, and there was also some other, there's other evidence out there that goes to show that, yes, perhaps they were, in fact, doing exactly what they were accused of doing and exactly what Ms. Casey stated that they were doing in the paper. The district court held that, you know, it was unreasonable for Sue Ashworth and then Debbie Revel to think that an attorney, and there's even italics about this, an attorney would act in this way, you know, in front of cameras and whatever. And while we understand that some of the evidence that would go to show, you know, what they were actually doing, what they actually knew at the time, isn't necessarily directly germane to the probable cause inquiry itself, there's still the question, if Sue Ashworth was right, right, if they did, in fact, know, and if there's a genuine issue of material fact as to whether they took those phones knowing what was on them and even knowing, you know, that they were going to be sought after for law enforcement, knowing that the child pornography in, not just of the stepdaughter, but also of other children was an ongoing issue, if she was right about it, wouldn't that show that she was reasonable? Yeah, let me ask you a question about that because I'm really concerned with construing this state statute. This is a question of state law, I think, about how this statute should be construed, but I'm really concerned about construing it in a way that would just make illegal attorney conduct generally. I mean, just so let's say an attorney just says to his client, hey, the cops are going to ask you a bunch of questions. Don't answer the questions. Is that obstruction of justice under the statute, under your reading? No, Your Honor. Okay, why? The attorney is advising his client not to give the cops information that they are trying to get. Well, for one, of course, because a person has the right to refuse to speak. You don't have the right to resist a lawful warrant. Well, but they weren't resisting a lawful warrant. I mean, that's the issue is that had the warrant been served and then the attorney was like, hey, throw me your phone and I'll run away from the cops, I could see the reading that you're proposing, but this is before the warrant was served. Let me give you another hypothetical. Let's say that someone who's committed a crime comes to an attorney and says, hey, I need help. I think I'm about to be investigated for this crime. What do I do? And the attorney gives that person advice about what to do if they think that they're being investigated for a crime. I mean, that advice could include, for example, you know, if you've got child pornography on your phone, get rid of it, right? Is that a crime? Is that obstruction? Not necessarily. Okay. I mean, what's the difference? But I think that if the attorney was like, you know, bury the body, right, that would be obstruction. And part of what— Yeah, but what's the difference, I guess? Why is this like bury the body versus get rid of the child pornography on your phone? It goes to several different factors. It goes to the nature of the crime. It goes to the nature of the act itself, whether, you know, so burying the body. I mean, deleting child pornography, having child pornography is illegal. Deleting child pornography is not inherently illegal. Neither is giving someone a phone. I mean, what if the attorney said, what if someone goes to a lawyer and says, hey, I think I'm about to be arrested. The cops are about to arrest me. And the attorney says correctly, well, if they arrest you, they can do a warrantless search of anything on your person. So if you have something on your person that would be incriminating, you should not have it when they arrest you. Is that obstruction? Not necessarily, Your Honor. Not necessarily. That's not a very good answer. I mean, you're arguing for us to basically interpret the statute where attorneys trying to help their clients avoid criminal prosecution is itself a crime. And I'm trying to figure out how we can do that in this case and not in all the other cases where that's like the job of a criminal defense attorney. One thing I want to point out is that in the briefing, there was actually, and this is, you know, we've now got attorneys represented by attorneys. There is a question about whether or not under Alabama's, either under Alabama's warrant statute or under exigent circumstances, Deputy Ashworth actually had the right to get the phone, which I think does differentiate this particular situation in that it is, it was an active, I see my time is up. May I continue? Yes. You may proceed. Thank you. So the question of whether she had the right to seize those phones right then, I think, is something because it is an active, ongoing, right that second, law enforcement, not something in the future, not something hypothetical. She's right there and then. The other point I would make is that there are all these questions about how far does it go? What does the obstruction statute mean? That's another point with the clearly established law is that our obstruction statute has not been well defined. There are two court of criminal appeals cases on that, which reached opposite results. And, you know, there's just a handful of cases from the circuit on it. There's no Alabama Supreme Court cases. So these questions about how far does the obstruction go, how far does the statute go, you know, that's what qualified immunity is for is when we're looking at this clearly established law and what our officers are supposed to do in this very, very unique factual circumstance that's before them. Let me ask you the same question I asked Mr. Wilson. How critical is it to your analysis that we have a situation where what was being passed from the criminal defendant or potential criminal defendant to the attorneys was, in fact, contraband itself? I think it's important. I don't necessarily think it's determinative. But I think it is very important in this case, both, of course, for the separate child pornography, but also because under the obstruction statute itself there's the independently unlawful prong that also goes into the idea of, you know, whether they had the right to get the phones under exigent circumstances. Obviously, you know, knowing that there was child pornography on that would be a factor in the exigent circumstances analysis if that were, you know, if we were presented with the case where it was a, where she had just taken the phones by force. Thank you, Ms. Raleigh. You still have two minutes for rebuttal. Thank you. And if I mispronounced your last name, my apologies. Mr. Gespass, you have 13 minutes. Thank you. May it please the Court. My name is David Gespass. I represent Megan Garcia in this case. I just want to start just to clarify one thing that was raised in questioning. Ms. Ashworth said that she was uncertain. She consulted with the district attorney for assistance in determining whether or not what she should do, and she then said she made an independent choice to make the arrest. Eventually, she said it was her decision based upon the advice she received from the district attorney's office. But does that matter? I mean, you make a point in the brief that Mr. Ratliff, I guess, testified at some point that he never thought there was probable cause or he never saw anything. But if there was probable cause as a legal matter, then what either one of these folks thought doesn't matter at all, does it? I don't know how much it matters, Judge. That was mostly to clarify what was raised before. I think that the question remains. Well, I'd say there are two questions. One is whether there was sufficient arguable probable cause to overcome the grant of summary judgment. But there's a separate question, which is whether there are sufficient material facts in dispute to affirm the denial of summary judgment to the defendants. And in that regard, I think there are a couple of important points to be made. Most specifically, there is, as far as the defendant's motions are concerned, there is a disputed material fact as to whether or not Ms. Ashworth knew at the time of the arrest that the attorneys had even been given the DHR file. Her testimony at the criminal trial was, at that time, she did not know what was in the envelope. And she knew the file had made its way to the courthouse, right? Maybe and maybe not. Well, where's the not? I understand your point that she testified later that she wasn't sure exactly what was being handed, but I didn't think it was disputed that she knew that the file had arrived at the courthouse and that something had been passed to the judge and had gone off in chambers. I thought all of that was undisputed. Right. Yeah. Okay. I accept that. She knew. She was told. There's evidence that is uncontradicted that she was told the day before that Ms. Ward would be bringing the file to the courthouse. But her testimony at the criminal trial was, I don't know what was in the envelope that was given to the judge. Right. But when we're dealing with probabilities and things like that, isn't that a fair inference? If you're an officer and know that this file with this incriminating information is going over, you know what the hearing is about. You know who's going to be there. You know that something, some folder passes from one person to another and then everyone goes off in this room and looks at it together. Isn't a fair inference from that when we're dealing with probabilities that that's what that was? Sure. It's fair. That's one possible interpretation. My point is it's a fact and dispute because a reasonable jury could determine that at the time, Ms. Ashworth did not know what was handed to the court and, therefore, that is something, and since that was one of the two points that were being raised as giving rise to probable cause, that that would not be a factor as to the defendant's motions. It clearly is a factor as to our motion for summary judgment. But accepting the facts in your view, Ashworth did not know exactly what was in the file. She's making some assumptions. She knows what went over the day before or what was coming over that day. That's just entitled to no analysis in the probable cause determination without her knowing for certain what it was? My position, judges, that that is not appropriate for summary judgment because it's a fact and dispute. And that is a matter for the jury. And a jury could certainly find that she made that determination, but a jury could find otherwise. In any event, all that they then said was that they had time to read the file. There was no evidence at all that they knew that they read the file, that the plaintiffs read the file. The plaintiffs deny having read the file. Ms. Ashworth testified at her deposition she had no idea whether they read the file. So the fact that they had time to read the file is pure speculation. Okay. Let's just, I think, just assume for the purposes that that's fine. So the file issue comes out of the case. The cops still had a video of the phone that they were going to seize pursuant to a search warrant being handed to someone else. And then they didn't just look at it or something. They, you know, like stashed it in a bag. Why isn't that enough? Why isn't that enough? Well, it's not enough. Okay, why? Many of the reasons for your questions earlier, Judge. Well, those are just questions. I mean, I could ask you the same thing. I mean, I guess you would agree that they could be, I mean, just to give you hypotheticals for the other side, I mean, if someone who commits murder goes to the attorney that they're going to hire for their defense and says, here's the murder weapon, will you please hide this for me? And the attorney takes it and buries it in the attorney's backyard, you would agree that would be a crime, right? Sure. Okay. What's the difference between that and this? The difference is that there's no evidence that the plaintiffs knew at the time that there was contraband on that phone. Why? That is speculation. That is suspicion. It's not knowledge. What about the fact that Ashworth had a search warrant for the phones that, as Judge Brasher has pointed out, a judge had signed off on the probable cause assessment that there was very likely child pornography on those phones. How is that not enough for arguable probable cause to arrest the plaintiffs for taking possession of the phones? Because it's still a matter of mere suspicion. First of all, all Ashworth knew was that she had a reason to get a search warrant, not an arrest warrant. She had probable cause to believe that there may be contraband on the phone, but she didn't have evidence to arrest Mr. Edwards at that time. That's why she got the search warrant. Then we go to she now suspects that the plaintiffs not only took the phone and, frankly, a lot is made about their secretively, infertively doing that. They did it in front of a camera and just put it in a briefcase. They did that. There's nothing but suspicion, based upon her suspicion, that they had anything on that phone that was contraband, as opposed to using the phone for the purpose that they've expressed, which is to defend the protection from abuse case that they were in court on. What do we do with the Supreme Court's statements in Westby where the Supreme Court says, look, the cops don't have to sort of assume an innocent motive. The cops can operate on a reasonable assumption. I guess I'll use assumption for the lack of a better word, that someone is doing something for a wrong reason. They have to have more than mere suspicion, however. They have to have facts on which they're basing it. Well, I guess I think the Supreme Court in Westby was saying the cops can look at stuff you're actually doing out in the world. They can see you do something, and they can, instead of inferring an innocent motive, they could say that seems like a criminal motive. Why isn't that this situation where the cops see someone taking the evidence that they've come to get that they think has child pornography on it, hiding it or putting it, placing it, maybe hiding it's too bad of a word, but placing it in a receptacle, walking away when they're about to show up at the search warrant? Why can't they say that looks like a bad motive to us based on what we saw happen? I think that gets to the totality of the circumstances, Judge. Sure. That is something that can be considered. But I would note, in particular, the Kingsland case that was cited in Cozy, where the police arrested a woman, I think, for a DUI, ignoring all of the evidence that it was innocent. And here I would suggest that, one, all the defendants had was suspicion that they had even looked at the DHR file and had any idea that there was anything, that Mr. Edwards was even being investigated for child pornography. Two, there was suspicion that he told them about that and that they took the phone for that reason. But on the other side of that, let me posit it this way. On one hand, the question is, what would a reasonable police officer do? But here, what would a reasonable lawyer do under these circumstances? Would a reasonable lawyer take the phone in a courthouse, in public view, not hidden away somewhere, even where they could be overheard, knowing that there was a camera watching? I guess you keep coming back to this camera. I think that there are so many cameras in this world that we don't often recognize they are cameras. And there are any number of times that people can do something, they're tucked away in an alcove, and then realize there's a camera. So I think it goes back to Judge Brasher's question, why do we have to assume the innocent motive? Why do we have to assume when the lawyers and Mr. Edwards are tucked into an alcove that they were aware of the camera? I think the police officers have said it looked furtive when all of a sudden they realized they were on camera. Well, I don't think that was necessarily what was said. What Sergeant Ratliff said was, you saw the camera, you were looking at it, and you looked at it, and you looked at it. And the question then becomes, why would they take the phones? I have no idea why they would do that. I had a bank robbery case where the bank robber was wearing a mask, asked for the money, and pulls his mask down so he could speak more clearly to the teller. I mean, these people are idiots. I mean, I have no idea why they would do it, right? I mean, does a cop have to say, like, we've got to think that criminals are doing reasonable things? It's so obvious they're committing a crime, it must be an innocent explanation? I mean, it just seems kind of far-fetched. Well, I'm saying that no reasonable lawyer would act in that way. I don't know. I don't know. I know a lot of lawyers. I mean, I understand, Judge, lawyers commit crimes, lawyers do unethical things. But I don't know that it's reasonable to think that under those circumstances, when they only have suspicion that the lawyers had any knowledge that there was anything on those phones that was contraband, when they only had that suspicion. But the district court, and we've talked about what Westby has said, that the cops don't have to assume an innocent motive. And the district court seemed to, time and time again, assume an innocent motive because these were lawyers. And so how does the district court's analysis, how do we deal with that analysis in light of Westby? Well, Westby, if I can just, this may take a little more time. You know, Westby says there is the rare obvious case where unlawfulness is sufficiently clear. There is, recall Hope v. Pelzer, which this court, the Hitchinpost case, which this court found, found the qualified immunity in the Supreme Court reversed. Is it obvious to anyone that— That's like a difficult analogy. I'm sorry? That seems like a difficult analogy. If your point is that this is sort of open and obvious compared to that case, I think it's difficult. Well, I would argue that in, you know, that the totality of the circumstances, yes, all they had was suspicion. All they had was suspicion. And if they had, they did not have evidence of any illegality. And they had evidence otherwise. There was Ms. Ashworth herself, as I said, only had probable cause to get a search warrant. There is nothing in the record that indicates, that demonstrates beyond suspicion, that the attorneys had any knowledge that they were doing anything other than representing their client in a PFA, the Protection from Abuse. Sure. Yeah, I just want to ask, so we had a dialogue with Mr. Wilson earlier about the right way to formulate arguable probable cause. So just as a legal question, he said, well, when the court uses the phraseology arguable probable cause, what we're sort of saying is, was there clearly established law that prohibited the search? Or was it, you know, prohibited with obvious clarity? So we're sort of taking the two exceptions to qualified immunity or the two ways to defeat qualified immunity and like putting that in arguable probable cause. What do you think about that as just a legal question? I don't think there's any difficulty with talking about arguable probable cause. I may have some questions about qualified immunity, but that's for another court at another time. I think that all arguable probable cause means is perhaps there was probable cause, but there was nothing clearly established about it. So I don't think that the use of the term at all confuses what the issue is. I think it's not at all your obligation to show a violation of clearly established law. No. Sure. Okay. Thank you. Mr. Tartt, you have seven minutes. Good morning, Your Honors. The deputies started out their argument, as they mentioned in their reply brief, the same, by saying the quiet part out loud, right? They told this Court that they were guilty of what they were accused of doing, as if that's some type of justification for an unlawful act. First, it's not, right? If an arrest is illegal, if a search is illegal, the fact that they may have turned out right in the end doesn't play into the Fourth Amendment analysis. More importantly than that, they were not right. The attorneys were acquitted of what they were accused of doing. They were not guilty of what they were accused of doing. They're not guilty of what the deputies and DAs now are alleging, which is knowing possession of child pornography. And I think listening to all of the arguments, everything is kind of getting a little mushed together here, right? You've got separate different crimes that they're trying to put an analysis for arguable probable cause under, whether it's possession of child pornography, whether it's obstruction of governmental operations, whether child pornography fits into the obstruction as an independently unlawful act. What this Court has to do under precedent is look at each of those allegations and apply the facts known to the officer at the time to see if that gives rise to arguable probable cause or, if it's like the District Court found, only mere suspicion. All of the facts that they have argued in briefing and argued up here in front of this Court are inferences, suspicions, and beliefs. They have not put any facts into this record that support probable cause that the attorneys knew that there was an investigation into child porn, that the attorneys knew what was in that file or read the file, that the attorneys had any idea that there would be child pornography on those phones. As Judge Brasher pointed out, these attorneys are just doing normal attorney things. They're talking to their client after a hearing in a courthouse. This isn't really a secluded alcove tucked away in a basement somewhere. It's steps outside of the courtroom. The DHR investigator is so close that she claims she can overhear them discussing. It's not only the camera there. Would they be out there talking about, under a reasonable standard, talking about knowingly possessing child pornography when the investigator, who they do know is the investigator, I suppose, is standing right beside them? No. Speaking of that, are you talking about Ms. Ward? Yes, Your Honor. She says she heard them say they're going to be coming for the phone soon or something like that. In terms of summary judgment, we accept that. Why would that not be a significant factor in the analysis? So I think it depends on which summary judgment, right? If it's our summary judgment inference to the deputies that, yes, Ward heard that, right? It is a disputed fact by both of the attorneys that they said, right? I understand that. And also, there is no evidence for our motion or their motion that Ashworth knew that fact. The fact that Ward knows it and the officer did not, that can't play into your role. That's not a fact to consider in supporting probable cause because it's not known to the officer at the time. You don't impute that, what everything that all law enforcement knows doesn't get imputed to the officer at the time? Say that again. I'm sorry. There's no imputation of what other officers know to the arresting officer at the time? Not with a DHR investigator, Your Honor. They're not a law enforcement at that point. That collective knowledge doesn't come in from a DHR investigator. If another deputy had known it at the time, perhaps it would, but that's different than what we're dealing with here. On your contraband question that was discussed, I believe it is an important part of the case to examine. But you still have to look at it from the facts that were known to the officers at the time. And in order to get to that actually being contraband to use, the attorneys would have to know that it's contraband. And there's nothing in the record that suggests Mr. Revel and Ms. Garcia knew that the phones would contain contraband. The only thing that they can point to is this affidavit from Peavey, who also worked at and was a lawyer with DHR, that says she told Garcia something about the investigation at a prior hearing, right? First, that's disputed. Second, there is absolutely nothing that says Revel knew of it either, right? And so there's nothing that you can look at in the record to say that Victor Revel or Ms. Garcia knew that there was child pornography on those phones. Ms. Peavey does not allege, and nobody has even argued that that fact was relayed to the investigator who asked for it. So just like the conversation in the hall, the fact that there may have been child pornography, to our knowledge, that was not known by the officers at the time of the arrest or prior to the arrest. And for the DHR file that we talked about, the knowledge of the attorneys is the focus point, I believe, right? Now, I think it's still arguable whether or not Ashworth even knew that the file was handed to them. But there is nothing in the record, I think Ashworth even admits in her deposition she doesn't have any facts to say that the attorneys actually reviewed the file. There's not a single witness. She went and talked to the judge that was back there. She talked to the other attorneys that were back there. Nobody can say they read the file. If they don't have knowledge of what's in that file, it doesn't matter. It doesn't matter. Take that file out. Take the knowledge of everything in there. Then they're just attorneys doing normal attorney things. They're talking to their client, and they get a phone. It's just like getting a record. It's not getting a bag of drugs. That phone could have been, and they did say before they were arrested, we were given the phone to use in his defense. That's a fact that they knew, right? But, I mean, it could have been anything. They could have found the phones on the floor. It could have been the kid's phones that they were bringing to give back to the mother, and he couldn't talk to the mother, so he had to give it to the attorneys. There's a hundred different innocent explanations for why they were getting those phones. There's nothing to suggest that just handing a phone is illegal in and of itself. It has to be a knowing exchange that you knew what was on those phones, and there's nothing to suggest that the attorneys did know. At best, it's in dispute, and it's only in dispute based on inferences and suspicions, not on facts, and that's what you have to look at because probable cause is based on that knowledge at the time, right? And you get to clearly establish, because it is clearly established, that an officer making an arrest without arguable probable cause based on mere suspicion is clearly established. It goes to the second way that you prove, a clear legal principle applied to novel facts, and that's what the district court here did. She didn't ignore it like the appellants say that she did. She conducted a reasonableness determination. She looked at all of the facts. She didn't focus on innocent. She did put that in there, but that wasn't the primary focus. It's the overall totality of the circumstances, which is what the law required her to do. Thank you, Mr. Tartt. Thank you. And, Mr. Wilson, you have two minutes remaining, but before you get started, you mentioned the ex parte City of Montgomery case that you said you have not briefed. I'm going to ask you to do so within seven days. Would that work? Oh, sure. Yes. And I'll provide an opportunity to respond once that comes in. Absolutely, Your Honor, and thank you for the opportunity to do that. Would you like that in a 28-J format? That's fine. Perfect. All right. So, I'd like to make a few quick points in response to your judges' questions with my friends on the other side. Judge Brasher, you voiced a concern about potentially interpreting the State's obstruction statute in a particularly hostile way to — that could be over-inclusive and capture things that normal attorneys do. I would suggest that the back-and-forth with my friend, with my colleague on this side, suggests that the law is not clearly established. That's enough to end the case. As my friend explained, there is no Alabama Supreme Court case expressly explaining what the obstruction statute means. Qualified immunity exists for exactly that person. Judge Branch, you asked about the importance of the phones actually containing child pornography and being contraband. I would agree with my colleague and say that we don't need it to win, necessarily, but the fact that there was child pornography on those phones and that the defendants had a reasonable — could reasonably have thought that there was child pornography on those phones is enough to end the case because possession of child pornography is, of course, a violation of Alabama law, and attorneys aren't immune from that. Judge Windsor, you asked about — I hate to interrupt you, but that just can't be right, right? I mean, district judges all over the state of Alabama have child pornography on their computers right now, right? Probation officers do. I mean, I'm sure the DA's office does. I'm sure criminal defense attorneys have to be able to view that and possess that as necessary to conduct their activities. That just can't be right, that all that's in violation of this statute because there's no exception. Yes, Your Honor, and I think that in situations like that, we see the attorneys being particularly careful when reaching out to the attorney general's office and saying, hey, can we host this on your servers because we are particularly concerned that if we possess this, we're going to go to jail. So I think that actually attorneys do interpret the statute very forcefully and acknowledge that it does apply to them and doesn't necessarily have a cause. Yeah, but there's no exception for the AG's office staff either, though, in the statute, right? Well, I think that that's right, Your Honor. So, I mean, I guess that's my point. Like, this seems like the kind of exception that if you were to talk to a state legislator and suggest that they needed to put this exception in there, they would say, no, we don't. That's silly. I guess that's — For the AG's office, I would agree that it is silly, but I think that in the context of attorneys themselves, we see in, you know, Alabama Bar — Alabama Bar ethical discussions about what to do when evidence that your client gives you is just too hot to handle, and they often say, well, you've got to give that to law enforcement. So it's acknowledged that law enforcement can possess that. It's not acknowledged that attorneys can possess that. Okay. I do see that I'm out of time. If I could address Judge Windsor's question, Your Honor. Judge Windsor, you were going to the substance of the potential dispute, I think, as to Ashworth's knowledge. Now, on summary judgment, my friends on the other side have to show, the nonmovement has to show, is a genuine conflict of material fact. Now, the conflict here is not genuine, and the fact is not material. The conflict isn't genuine for the reasons that we laid out in our brief. The testimony from a different proceeding, the criminal proceeding that Deputy Knox say, as my friend was representing, that she didn't know what was in those files by the time she arrested the plaintiffs. Now, regardless, I think Your Honor was getting to the crux of the issue as to whether it's a material fact. What my friends on the other side are arguing is that she didn't know the exact pages, the exact file, the exact DHR printout that was handed. That's immaterial because what they did know and what they don't rebut knowing is that the plaintiffs had subpoenaed DHR files from Carrie Ward. Carrie Ward showed up and gave those files. That was the only reason for Carrie Ward's presence at the courthouse. She was providing information about the investigation, and I would remind you, Your Honor, that Deputy Ashworth was involved in that investigation and therefore knew exactly what was going to be in that investigation, in that investigative file, and that that would undoubtedly include information about the phones. Thank you. Thank you. Two minutes. At the very end of his remarks, Mr. Tartt said, and I'm roughly paraphrasing, but I think I'm fairly close, that it was clearly established that acting without probable cause is a violation of the Constitution. And I think it's that formulation that gets to why this concept, how this concept of arguable probable cause, which we agree can be very useful, has kind of gone awry. Because to say it's clearly established that acting without probable cause is illegal is just saying illegal behavior is illegal. It's the tautology that the Supreme Court has and this Court have consistently warned against. It's got to be the clearly established portion goes into that arguable probable cause analysis, and that's what was missing in the district court's opinion, and that's what's missing in Ms. Garcia and Mr. Revels' analysis of that. There's also been a lot of knowledge talk about, you know, what they knew and what she knew that they knew and he knew and they knew, whatever. For the purposes of probable cause, right, you don't have to have independent evidence of intent. And that's a major, we think, legal error with the district court's opinion, with Ms. Garcia and Mr. Revels' approach to this case, is this idea that she had to really, you know, know. Well, of course, Deputy Ashworth didn't know. She never knows. And even when you get to actual criminal cases, right, you can infer intent. That's all we can really do most of the time is infer intent from the action. So here what you have, unlike in Sekozy, which the district court relied heavily on, they did what they were thought to have done, right? They took phones containing child pornography, stuck them in a satchel, and then indicated that they wouldn't fight back. Thank you, Your Honors. Thank you. Thank you all. We have the case under advisement.